# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **SUNGLORY MARITIME LTD., et al.** | **CIVIL ACTION** |
| **VERSUS** | **CASE NO. 15-896** |
| **PHI, INC., et al.** | **SECTION: "G"(5)** |

## ORDER

Before the Court is Defendant PHI, Inc.'s ("PHI") "Motion for Partial Summary Judgment,"[1] wherein PHI argues that the plaintiffs in this case are not entitled to an award of maritime "salvage" under either general maritime law or the 1989 Salvage Convention ("Salvage Convention") for their role in an incident in which a helicopter landed aboard an anchored vessel after experiencing unusual vibrations while in the air. Having considered the motion, the memoranda in support and in opposition, the record, and the applicable law, the Court will deny the motion.

## I. Background

### A.    *Factual Background*

On March 24, 2013, a helicopter operated by PHI was traveling on an outbound flight over the Gulf of Mexico, carrying two crew and seven passengers.[2] When the helicopter was approximately 10 miles from shore, the pilot in command, Dean Cole ("Cole"), detected an unusual vibration coming from the aircraft.[3] Unsure of the source of the vibration, and about 50 miles away from the destined platform, Cole turned the helicopter around and headed for shore.[4] The vibrations

---

[1]  Rec. Doc. 17.

[2]  Rec. Doc. 17-4 at p. 1.

[3]  *Id.*

[4]  *Id.*

continued and grew somewhat in duration and strength.[5]

When the helicopter was approximately six minutes from land, it flew above a staging area for the port of Corpus Christi, where cargo ships anchor awaiting berths.[6] With several ships in sight, Cole decided the safest course of action was to land on one of the anchored vessels.[7] Without calling the vessel first to request permission to land, the helicopter landed on the AEOLIAN HERITAGE ("the Vessel"), a vessel owned by Sunglory Marine Ltd. and managed by Aeolian Investments S.A. (collectively, "Plaintiffs"), which contained a hatch cover designated "H," which is usually associated with helicopter operations.[8] The Vessel did not suffer any damage from the landing.[9] The Vessel ultimately transported the helicopter into port in Corpus Christi, where the helicopter was removed from the ship and the helicopter crew disembarked.[10]

## B.  *Procedural Background*

Plaintiff filed its complaint on March 23, 2015.[11] On January 5, 2016, Defendant filed the pending motion for partial summary judgment.[12] Plaintiffs filed an opposition on January 12, 2016.[13]

---

[5]  *Id.* at p. 2.

[6]  *Id.*

[7]  *Id.*

[8]  Rec. Doc. 1 at pp. 3–4.

[9]  Rec. Doc. 17-4 at p. 2.

[10]  Rec. Doc. 1 at p. 4.

[11]  *Id.*

[12]  Rec. Doc. 17.

[13]  Rec. Doc. 25.

With leave of Court, Defendant filed a reply brief on January 20, 2016.[14]

On January 11, 2016, the parties filed a joint motion for extension of deposition deadlines for additional time to complete the Federal Rule of Civil Procedure 30(b)(6) deposition of Plaintiffs, a deposition of Chief Mate Spyridon Panagiotoplous, and PHI pilot Joshua Brackett.[15] The Court granted the motion on January 12, 2016.[16]

## II. Parties' Arguments

### A.   Defendant's Arguments in Support of Partial Summary Judgment

In support of partial summary judgment, PHI begins by alleging that, as Cole headed for shore after detecting an unusual vibration coming from the aircraft, he tested the helicopter's controls and found no obvious problems.[17] PHI claims that Cole was unable to reach air traffic control and, after receiving no reply, the helicopter crew activated the satellite tracker's emergency switch.[18] According to PHI, Cole's co-pilot told the aircraft's passengers that the helicopter was experiencing vibrations and they were headed back to shore to make a precautionary landing, but the situation was under control.[19] PHI claims that neither Cole nor his co-pilot declared an emergency, and that although the helicopter was "fully controllable," the vibrations continued to occur and grew somewhat in duration and strength.[20] Therefore, PHI alleges, Cole decided to land

---

[14]  Rec. Doc. 32.

[15]  Rec. Doc. 23.

[16]  Rec. Doc. 24.

[17]  Rec. Doc. 17-1 at p. 2.

[18]  *Id.*

[19]  *Id.*

[20]  *Id.*

on an anchored vessel, and, spotting the "H" designation on the AELOIAN HERITAGE, circled the helicopter around the Vessel to alert its crew that it was preparing to land.[21] However, PHI argues, the aircraft did not contact the Vessel via radio before landing, and the Vessel, which was anchored and stationary, did not take any action to facilitate the helicopter's landing.[22]

PHI alleges that, upon landing on the Vessel without incident, the helicopter crew performed a normal shutdown during which no vibrations were detected.[23] According to PHI, when the helicopter began to unload passengers, the Vessel crew told Cole that they assumed the helicopter was a Coast Guard helicopter making an inspection, and did not know the aircraft had made a precautionary landing.[24] PHI alleges that, without any assistance from the Vessel's crew, the PHI crew secured the helicopter with chocks and lines they had aboard the helicopter.[25] PHI claims that its mechanics were unable to find any obvious reason for the vibration while the helicopter was aboard the Vessel, so the aircraft was returned to shore and delivered to a dock where it was unloaded by PHI.[26] According to PHI, it was later determined that the tail rotor drive shaft was in need of repair.[27]

PHI agrees that Plaintiffs are entitled to their reasonable and actual out-of-pocket costs incurred as a result of the helicopter landing on the Vessel, and intends to amicably resolve

---

[21] *Id.* at pp. 2–3.

[22] *Id.* at p. 3.

[23] *Id.*

[24] *Id.*

[25] *Id.*

[26] *Id.*

[27] *Id.*

Plaintiffs' costs claim.[28] However, PHI disputes Plaintiffs' claim that they are entitled to an award

of maritime "salvage" under general maritime law and the Salvage Convention.[29] According to PHI,

although Plaintiffs allege that they qualify as voluntary salvors of the helicopter who should be

given a monetary award based on the value of the helicopter, a maritime salvage award in this case

would be wholly unprecedented.[30]

　　　PHI argues that, historically, property subject to a claim of salvage has included vessels,

property aboard vessels, property thrown overboard or jetsam, property found freely floating on the

sea or flotsam, property on the sea attached to buoys, and property washed up to shore—in other

words, property with a "strong maritime nexus."[31] For example, PHI argues, the Second Circuit held

in *Lambros Seaplane Base v. The Batory*[32] that a seaplane that crashed in navigable waters was

subject to salvage, whereas the Eighth Circuit in *Provost v. Huber*[33] held that a house that broke

through the ice during transport across a frozen lake was not subject to salvage on account of lack

of nexus with traditional maritime activities.[34]

　　　PHI claims that, in order for Plaintiffs to be entitled to a salvage award, they must establish:

(1) the existence of a marine peril placing the property at risk of loss, destruction, or deterioration;

(2) a salvage service voluntarily rendered, which was not required by an existing duty or contract;

---

[28] *Id.* at p. 4.

[29] *Id.*

[30] *Id.*

[31] *Id.* at p. 6.

[32] 215 F.2d 228, 232–33 (2d Cir. 1954).

[33] 594 F.2d 717, 719–20 (8th Cir. 1979).

[34] Rec. Doc. 17-1 at p. 6 n.13.

5

and (3) the success of the salvage efforts, in whole or in part.[35] PHI does not dispute the third element, but argues that Plaintiffs cannot carry their burden in meeting the first element because the helicopter, which made a precautionary landing after experiencing vibrations, did not face a "marine peril," and cannot meet the second element because the helicopter landed on the Vessel's designated hatch cover without the prior knowledge or assistance of the Vessel, and therefore the crew did not voluntarily render a salvage service.[36]

PHI contends that the typical salvage scenario involves recovering or rescuing a sinking, sunk, captured, or burning ship, or a ship that is in distress, as when facing severe weather.[37] By contrast, PHI alleges, "Plaintiffs claim salvage of a bone-dry, land-based civilian helicopter used to transport passengers to oil rigs."[38] According to PHI, historically, only vessels, cargo aboard a vessel, or objects somehow connected to a navigable structure used for transportation, could be the subject of salvage claims.[39] PHI avers that, in rare cases, some courts have extended claims of salvage to non-vessel property recovered in navigable waters, as in *Tidewater Salvage, Inc. v. Weyerhaeuser Co.*,[40] a Ninth Circuit case holding that floating logs lost from water storage at a nearby mill were derelict property subject to salvage, and *Broere v. Two Thousand One Hundred Thirty-Three Dollars*,[41] an Eastern District of New York case that determined that money found on

---

[35] *Id.* at pp. 6–7 (citing *United States v. EX-USS CABOT/DEDALO*, 297 F.3d 378, 381 (5th Cir. 2002)).

[36] *Id.* at p. 7.

[37] *Id.*

[38] *Id.*

[39] *Id.* (citing *Cope v. Vallette Dry-Dock Co.*, 119 U.S. 625, 629–30 (1887)).

[40] 633 F.2d 1304, 1306 (9th Cir. 1980).

[41] 72 F. Supp. 115, 118 (E.D.N.Y. 1947).

the floating corpse of a drowned vessel passenger qualified as salvage of a derelict.[42] However, PHI claims, such cases are "extremely rare and the exception to the rule," and all involve property that was derelict, lost, or otherwise "abandoned" in which the salvor took affirmative action to recover the property.[43]

In *Lambros Seaplane Base v. The Batory*, PHI claims, the Second Circuit held that a seaplane that was abandoned by its pilot after safely landing on the ocean surface was subject to the admiralty law of salvage because it was designed and intended to operate on water, and was subject to many of the same conditions as ordinary vessels while floating on water.[44] However, PHI avers, few courts have allowed land-based aircraft to be the subject of a salvage claim, and have only done so where the aircraft crashed into navigable waters and was abandoned by the owner.[45] Furthermore, PHI claims, at least one court—the District of Maine in *Historic Aircraft Recovery Corp. v. Wrecked & Abandoned Voight F4U-1 Corsair Aircraft*—has strongly questioned the extension of the law of maritime salvage to claims regarding even abandoned aircraft.[46] There, PHI avers, the court noted the Supreme Court's reluctance, in *Executive Jet Aviation v. City of Cleveland*, to extend admiralty jurisdiction to matters involving aviation, quoting the Supreme Court as stating that the rules and concepts developed through long experience in admiralty law would be "wholly alien to air commerce, whose vehicles operate in a totally different element, unhindered by geographical

---

[42] Rec. Doc. 17-1 at pp. 7–8.

[43] *Id.* at p. 8.

[44] *Id.* (citing 215 F.2d 228, 232–33 (2d Cir. 1954).

[45] *Id.* (citing *Int'l Aircraft Recovery L.L.C. v. Unidentified, Wrecked & Abandoned Aircraft*, 218 F.3d 1255, 1256–57, 1260 n.13 (11th Cir. 2000), *cert. denied*, 531 U.S. 1144 (2001)).

[46] *Id.* (citing 294 F. Supp. 2d 132, 139).

boundaries and exempt from the navigational rules of the maritime road."[47]

PHI argues that, although there are a few examples in which the law of salvage was applied to wrecked and abandoned aircraft, and one case in which it was applied to an abandoned, but otherwise functioning seaplane specifically designed to operate as a "vessel" while afloat, "no court has ever found that an aircraft which safely comes to rest on the designated helicopter landing location on a vessel, and never touches navigable water, is property that may be the subject of a salvage award."[48] According to PHI, the helicopter was not "lost at sea," "floating," or "cast upon the shore," but was instead, at all relevant times, in flight or on the deck of the Vessel, and within the possession and control of its owner.[49] PHI argues that the Fifth Circuit has clearly held that helicopters, unlike seaplanes, are not "vessels" for purposes of maritime commerce, even if they fly over the sea.[50] PHI avers that only one reported case involved salvage claimed specifically on a helicopter, and it is not relevant here because it involved an aircraft that was being carried as cargo.[51]

In sum, PHI claims, all of the cases in which the recovery of an aircraft has been deemed eligible for a salvage award have involved one or more of the following circumstances: (1) the aircraft was equipped to operate on the water's surface and was therefore considered a "vessel' while afloat; (2) the aircraft was carried as cargo; or (3) the aircraft was "lost to the sea," in that it was sunken or otherwise abandoned by the owner.[52] On the other hand, PHI argues, no cases have found

---

[47] *Id.* (quoting *Executive Jet Aviation v. City of Cleveland*, 409 U.S. 249 (1972)).

[48] *Id.* at p. 9.

[49] *Id.*

[50] *Id.* at p. 10 (citing *Barger v. Petroleum Helicopters, Inc.*, 692 F.2d 337, 339–40 (5th Cir. 1982)).

[51] *Id.* (citing *Sullivan v. Gen. Helicopters, Int'l*, 564 F. Supp. 2d 496 (D. Md. 2008)).

[52] *Id.*

that an operational, traditional aircraft could be the subject of a claim for voluntary salvage.[53]

Moreover, PHI contends, thousands of helicopter landings take place yearly on drill ships, mobile offshore drilling units, and other offshore support vessels in the Gulf of Mexico and elsewhere, often for the sole purpose of refueling, and sometimes because of inclement weather or operational conditions.[54] According to PHI, allowing a salvage claim in this case "would potentially open the door for vessel or rig owners to assert a claim for salvage every time a helicopter made a landing because of low fuel, storm activity or an operational concern," an outcome that would create an undesirable disincentive for a pilot to act prudently for fear of a salvage claim being asserted against the helicopter.[55]

Next, PHI argues that even if the helicopter is considered property subject to salvage, it was not facing a marine peril.[56] PHI contends that a marine peril exists when the maritime property is exposed to potential loss or destruction at the time the salvage services are rendered.[57] According to PHI, there must be a reasonable apprehension for the property's future safety;[58] without danger, the services cannot be called marine salvage.[59] PHI claims that it is a well-founded principle of salvage doctrine that "the peril which can be properly considered in determining a salvage award

---

[53] *Id.*

[54] *Id.* at pp. 10–11.

[55] *Id.* at p. 11.

[56] *Id.*

[57] *Id.* (citing *New Bedford Marine Rescue, Inc. v. Cape Jeweler's Inc.*, 240 F. Supp. 2d 101, 112 (D. Mass. 2003)).

[58] *Id.* (citing *Fine v. Rockwood*, 895 F. Supp. 306, 310 (S.D. Fla. 1995)).

[59] *Id.* (citing *In re Complaint of the City of New York, as Owner & Operator of M/V ANDREW J. BARBERI*, 534 F. Supp. 2d 370, 377 (E.D.N.Y. 2008)).

is not to be estimated in the light of subsequent or contingent events, but of the facts which surround the salvage service at the time it is rendered."[60] Thus, PHI contends, salvage awards are not appropriate for the rescue of property from "possible future perils," as salvage "is allowed because the property is saved; not because it might have been otherwise lost upon future contingencies."[61]

According to PHI, marine perils have been found in circumstances such as a vessel abandoned by its master, a vessel run aground, fire aboard a vessel, a vessel that has broken loose while in tow during a storm, a long-sunken ship/treasure salvage, and cargo adrift at sea.[62] On the other hand, PHI contends, courts have failed to find exposure to a marine peril in situations where, for example, a vessel was tied to a dock and had settled on the channel bottom,[63] the weather had dramatically improved from earlier hurricane conditions and a vessel was located afloat in a marina, secured to another boat,[64] a vessel had drifted out to sea during a hurricane, but then held fast at anchor and in calm waters,[65] or a vessel was adrift as the result of inclement weather, but could have returned to port under its own power.[66] Specifically regarding aircraft, PHI argues, "marine peril" has only been found when an aircraft is actually on or in the water, as allegedly occurred in *International Aircraft Recovery, L.L.C. v. Unidentified, Wrecked & Abandoned Aircraft*, an Eleventh Circuit case in which the parties did not dispute that an aircraft was in marine peril when the aircraft

---

[60] *Id.* (quoting *B.V. Bureau Wijsmuller v. United States*, 702 F.2d 333, 340 (2d Cir. 1983)).

[61] *Id.* at pp. 11–12 (quoting *The Emulous*, 8 F. Cas. 704, 708 (C.C.D. Mass. 1832) (citing *Westar Marine Servs. v. Heerema Marine Contractors, S.A.*, 621 F. Supp. 1135, 1144–45 (N.D. Cal. 1985)).

[62] *Id.* at p. 12 (citing 3A *Benedict on Admiralty* §§ 36, 42, 64 (2012)).

[63] *Id.* (citing *Fine*, 895 F. Supp. at 310).

[64] *Id.* (citing *Cape Ann Towing v. M/Y "Universal Lady"*, 268 F. App'x 901, 903 (11th Cir. 2008)).

[65] *Id.* (citing *Phelan v. Minges*, 170 F. Supp. 826, 828 (D. Mass. 1959)).

[66] *Id.* (citing *The Viola*, 52 F. 172, 172–73 (C.C.E.D. Pa. 1892), *aff'd* 55 F. 829 (3d Cir. 1893)).

had crashed in waters approximately eight miles off of the coast of Miami Beach.[67] However, PHI avers, it found no court case holding a "marine peril" existed where an aircraft experienced mechanical concerns while in flight and successfully landed undamaged on the deck of a ship.[68]

Here, PHI claims, the problems experienced by the helicopter, including vibrations of an unknown origin, constitute perils unique to air commerce, which bear no substantial relationship to the perils of the sea.[69] Furthermore, PHI argues, the decision to land on the Vessel and to remain aboard until the problem was diagnosed was dictated by the unique rules that govern the operation of aircraft.[70] Quoting the Supreme Court in *Executive Jet*, PHI argues that aircraft face unique dangers that are rarely attributable to the sea, including pilot error or defective design or manufacture, and thus "the determination of liability will . . . be based on factual and conceptual inquiries unfamiliar to the law of admiralty."[71] Furthermore, PHI claims, the evidence is undisputed that the helicopter was simply experiencing a vibration of unknown origin at the time of the precautionary landing, and that the helicopter was under full control and in no immediate risk of crashing.[72] Therefore, PHI contends, the aircraft was "not saved from immediate loss, but simply avoided the possibility of a future, but never realized, peril."[73] Moreover, PHI argues, the only services provided by the Vessel—namely carrying the helicopter to a berth for offloading—took

---

[67] *Id.* (citing 218 F.3d 1255, 1257 (11th Cir. 2000)).

[68] *Id.*

[69] *Id.* at p. 13 (citing *Executive Jet Aviation v. City of Cleveland*, 409 U.S. 249, 269–70 (1972)).

[70] *Id.*

[71] *Id.* (quoting *Executive Jet*, 409 U.S. at 270).

[72] *Id.*

[73] *Id.*

place after the landing, and were not rendered when the aircraft was in any peril whatsoever, let alone a marine peril.[74]

Furthermore, PHI argues, Plaintiffs cannot satisfy the "voluntarily rendered" requirement for a salvage service, which includes acts such as towage, firefighting, recovery of cargo, supplying men and stores, giving advice, preventing collision, raising a sunken craft or property, and standing by or securing aid.[75] PHI contends that, while acts requiring minimal effort, such as giving advice or standing by, can constitute salvage services, the law is clear that some act is required.[76] For example, PHI claims, the Fifth Circuit in *Petition of United States* held that, where a vessel's crew was ordered to provide salvage services but was not able to actually do so, no salvage award was warranted.[77] There, PHI argues, the Fifth Circuit found that "no member of the . . . crew handled the lines . . . or performed any act whose purpose was the securing or salvaging of the barges."[78] Similarly, PHI avers, a court in the Southern District of Florida has required a salvor to take "voluntary, affirmative action to aid, rescue or preserve the vessel, her crew, or cargo from a maritime peril."[79] Here, PHI argues, the Vessel took no affirmative action to assist PHI's helicopter in landing on the Vessel's designated helicopter landing spot.[80] According to PHI, the Vessel's crew did not clear objects from the landing spot, change course, or come to a standstill to allow the

---

[74] *Id.* at p. 14.

[75] *Id.* (citing 3A *Benedict on Admiralty* §§ 15–31).

[76] *Id.*

[77] *Id.* (citing 425 F.2d 991, 996 (5th Cir. 1970)).

[78] *Id.* (quoting *Petition of U.S.*, 425 F.2d at 996).

[79] *Id.* (quoting *Fine v. Rockwood*, 895 F. Supp. 306, 306 (S.D. Fla. 1995)).

[80] *Id.* at p. 15.

helicopter to land, nor did it secure the aircraft after it landed.[81]

Next, PHI argues that Plaintiffs, as the Vessel's owners, do not have a right to claim salvage in this matter.[82] According to PHI, the owner's right to recover an award does not originate from the same source as that which governs the rights of a vessel's master and crew to recover a salvage award.[83] PHI claims that "it must appear that the shipowner's property was actually risked or at least in risk of being affected for the owner to share in the award."[84] According to PHI, remuneration for salvage service is awarded to the owners of vessels on account of the danger to which the service exposes their property and the risk which they run of loss in suffering their vessels to engage in perilous undertakings.[85] Therefore, PHI argues, in determining a salvage award, one must distinguish the owners of vessels, who voluntarily contribute to the salvage effort by putting their property at risk, from the master and crew, who may risk life and limb in the actual salvage operation.[86]

Here, PHI contends, Plaintiffs cannot show how a helicopter, under the control of its pilots and making a precautionary landing, posed an imminent and serious risk to their property.[87] PHI argues that the helicopter landed on the Vessel's specifically designated helicopter landing spot, and the Vessel suffered no damage from the landing.[88] Thus, PHI avers, despite Plaintiffs' allegations

---

[81] *Id.*

[82] *Id.*

[83] *Id.*

[84] *Id.* (quoting Martin J. Norris, *The Law of Seamen* § 9:13 (4th ed. 1985)).

[85] *Id.* (citing *The Camanche*, 75 U.S. 448, 477 (1869)).

[86] *Id.*

[87] *Id.* at p. 16.

[88] *Id.*

regarding the imminent demise of the helicopter or its passengers, speculative damages cannot give rise to a claim for salvage.[89] Furthermore, PHI argues, even if the master and crew provided salvage services, neither the crew nor master were joined as plaintiffs.[90] According to PHI, although all those who render service in a salvage operation may share in an award,[91] Plaintiffs may not step in the shoes of the crew for purposes of obtaining a salvage award, and may only recover an award based on their own voluntary contribution and potential risk to their property from the salvage operation, which here was non-existent.[92]

Finally, PHI argues that although Plaintiffs allege a right to salvage under both general maritime law and the Salvage Convention, which was ratified by the United States in 1991, "an exhaustive search of maritime cases, treatises, and the like has demonstrated that in most cases the Salvage Convention is not invoked by the parties and is rarely mentioned by U.S. courts."[93] PHI claims that the Salvage Convention's predecessor, the 1910 Brussels Convention on Salvage, was likewise rarely relied on or even mentioned by courts in older salvage cases.[94] According to PHI, the Fifth Circuit has not specifically expressed an opinion on whether the general maritime law of salvage survived the Salvage Convention, but in *Solana v. GSF Development Driller I*, it assumed,

---

[89] *Id.* (citing *B.V. Bureau Wijsmuller v. United States*, 702 F.2d 333, 340 (2d Cir. 1983); *The Emulous*, 8 F. Cas. 704, 708 (C.C.D. Mass. 1832); *Westar Marine Servs. v. Heerema Marine Contractors, S.A.*, 621 F. Supp. 1135, 1144–45 (N.D. Cal. 1985)).

[90] *Id.*

[91] *Id.* (citing *St. Paul Marine Transp. Corp. v. Cerro Sales Corp.*, 505 F.2d 1115, 1117 (9th Cir. 1974)).

[92] *Id.* at pp. 16–17.

[93] *Id.* at p. 17.

[94] *Id.* (citing William L. Neilson, *The 1989 International Convention on Salvage*, 24 CONN. L. REV. 1203, 1250 (1992)).

without deciding, that general maritime law principles still remained applicable.[95] In fact, PHI claims, courts in the Fifth Circuit have only applied the Salvage Convention in connection with its list of factors to be considered in determining the appropriate value of a salvage operation, and that the list of elements of a salvage award in *The Blackwall*, an 1869 Supreme Court case, nevertheless "remains by far the most cited authority for salvage award determinations in the United States."[96]

Furthermore, PHI argues, the Salvage Convention retains most of the essential features of traditional salvage law, including the requirement of danger to property.[97] Because courts have not defined the requirement of "danger" pursuant to the Salvage Convention, PHI claims, the traditional requirement of "marine peril" should apply.[98] Similarly, PHI contends, the voluntary nature of salvage services remains a requirement, as does the risk to the salvaging vessel.[99]

### B.      *Plaintiffs' Arguments in Opposition to Partial Summary Judgment*

In opposition, Plaintiffs argue that there are disputed issues of material fact regarding: (1) whether the helicopter is property that may be the subject of marine salvage; (2) whether the helicopter was faced with a reasonable apprehension of marine peril when it made an emergency landing on the vessel in navigable waters; (3) whether the actions of the vessel and her crew constitute voluntary salvage service; (4) whether Plaintiffs, as vessel owners, have a right to claim

---

[95] *Id.* (citing 587 F.3d 266, 270 (5th Cir. 2009)).

[96] *Id.* at 17 & n.16 (citing *Baltic Captain Shipping Co. v. Blessey Enters., Inc.*, No. 06-2499, 2008 WL 4018550, at *7 (S.D. Tex. Aug. 29, 2008); *The Blackwall*, 77 U.S. at 1).

[97] *Id.* at pp. 17–18.

[98] *Id.* at p. 18.

[99] *Id.*

salvage in this matter; and (5) whether the 1989 Salvage Convention requirements have been met.[100] Furthermore, Plaintiffs argue, the crux of PHI's motion is based on the testimony of a single witness, the helicopter pilot, "whose testimony is noticeably biased in favor of PHI and disputed by the other facts in this case."[101] Plaintiffs claim that other "potential witnesses" dispute the pilot's version; those witnesses, however, are foreign seamen and/or are unavailable until trial, according to Plaintiffs.[102] Finally, Plaintiffs allege, the pilot would not have landed the PHI helicopter on the Vessel if the helicopter, pilots and passengers were not faced "with an imminent risk of having to 'ditch' in the Gulf of Mexico."[103]

Plaintiffs argue that this Court should decide, after judging the credibility of witnesses and seeing the evidence at trial, whether Plaintiffs are legally entitled to a salvage award.[104] Plaintiffs also argue that the Court should consider the equitable circumstances militating in favor of a salvage award.[105] According to Plaintiffs, a conclusion that the actions of the Vessel, her master and crew are insufficient to entitle Plaintiffs to a salvage award would "set precarious precedent by discouraging vessels from salving aircraft, their passengers and crew from danger in navigable waters of the United States, particularly without having heard the witnesses and without Plaintiffs having their day in court."[106]

---

[100] Rec. Doc. 25 at p. 1.

[101] *Id.*

[102] *Id.* at pp. 1–2.

[103] *Id.* at p. 2.

[104] *Id.*

[105] *Id.*

[106] *Id.*

Plaintiffs dispute many of the "seemingly straightforward" facts relied upon by PHI, and thus claim that summary judgment is inappropriate.[107] According to Plaintiffs, PHI's own admission establishes that the incident in question was an "emergency landing" on the Vessel, not a mere precautionary landing.[108] In fact, Plaintiffs argue, PHI's attorney stated in a Limitation of Liability and Hold Harmless Agreement that PHI's helicopter "was required to make an emergency landing on the Vessel."[109] According to Plaintiffs, the Vessel's chief mate stated that the helicopter appeared to be in distress because of unusual engine noises and smoke billowing from the helicopter.[110] Furthermore, Plaintiffs aver, following the landing, the pilot and passengers of the helicopter appeared to be in fear and shock and expressed their concern for the emergency they faced.[111] Plaintiffs contend that, after the landing, the Vessel's crew moved the helicopter from the starboard end of the hatch cover to the center in order to secure it in light of the prevailing weather conditions, to prevent any possible damage due to the ship rolling, and to allow inspection of the helicopter, since the tail was hanging over the ship's rail.[112] Plaintiffs argue that the helicopter's position was precarious, and the "majority of the vessel's crew assisted with this operation which was carried out using the vessel's slings and dunnage in order to lash the helicopter down in the middle of the hatch."[113] Plaintiffs claim that PHI has admitted through an e-mail sent by its counsel that the master

---

[107] *Id.* at p. 3.

[108] *Id.*

[109] *Id.*

[110] *Id.*

[111] *Id.*

[112] *Id.* at pp. 3–4.

[113] *Id.* at p. 4.

and crew of the Vessel took action to preserve the safety of PHI's crew and passengers.[114]

Plaintiffs allege that, after the landing, the Vessel's crew gave the helicopter pilots and passengers shelter, food and drinks, and that the pilots of the helicopter informed the Vessel crew that they had decided to land on the Vessel because they were concerned that they would not be able to make land and would have to "ditch" in the water.[115] Plaintiffs claim that the pilots had stated that the Vessel was the closest safe vessel they could locate with a designated helicopter hatch cover marking.[116] Furthermore, Plaintiffs aver, Cole's own deposition testimony establishes that the helicopter was in danger and that he could not diagnose the unusual vibration the helicopter was experiencing.[117] Plaintiffs allege that Cole did not have time to make any radio contact with the PHI base, the FAA, the Coast Guard, any of the ships at anchor, or the Vessel, so he engaged the emergency May-Day beacon on the helicopter's satellite communication system.[118] According to Plaintiffs, Cole had decided that making it to shore was not an option.[119] Plaintiffs claim that PHI's flight log for the date of the incident, filled out by the pilot, included an annotation that he made an "emergency landing" on the Vessel.[120]

Plaintiffs argue that the audible vibration experienced on the helicopter was not turbulence-induced, but was instead caused by broken bolts in the helicopter's tail rotor drive shaft, which was

---

[114] *Id.*

[115] *Id.*

[116] *Id.*

[117] *Id.* at pp. 4–5.

[118] *Id.* at p. 5.

[119] *Id.*

[120] *Id.*

ultimately replaced.[121] Plaintiffs claim that, had the Vessel not been available for landing, the helicopter would have dropped into the Gulf and likely sunk, endangering the lives of those aboard.[122] Plaintiffs aver that the seas were high and the wind was strong, and thus the likelihood of loss of life and property was high.[123] Plaintiffs allege that PHI dispatched two helicopters to the Vessel to pick up the passengers and deliver mechanics to fix the helicopter, but the mechanics were unable to determine the problem or fix it.[124] Thus, Plaintiffs claim, the helicopter was not airworthy, and the Vessel was stuck with an "orphaned helicopter" onboard, which resulted in delayed cargo operations and a deviation to shore to take the helicopter to a location where it could be discharged, all of which cost the Vessel time and money and was a continuation of the rendering of assistance to the helicopter.[125]

Plaintiffs aver that PHI's reliance on *Executive Jet Aviation v. City of Cleveland*, a Supreme Court decision, is a "red herring" because *Executive Jet* was a case about jurisdiction rather than salvage.[126] According to Plaintiffs, the Court's decision dealt with the application of admiralty jurisdiction to cases involving plane crashes that happen to end up in water, and there, the Court was concerned with pointing out that there was more to a finding of admiralty jurisdiction than location in navigable waters.[127]

---

[121] *Id.*

[122] *Id.*

[123] *Id.*

[124] *Id.* at pp. 5–6.

[125] *Id.* at p. 6.

[126] *Id.* at p. 7 (citing 409 U.S. 249 (1972)).

[127] *Id.*

Plaintiffs also argue that PHI's argument "that the court should hold the helicopter is not an object of salvage because it was a 'bone-dry' aircraft is nonsensical."[128] Plaintiffs aver that, under PHI's reasoning, Plaintiffs would only have a salvage claim if the helicopter had crashed into the water and the Vessel then hoisted the helicopter onto the deck.[129] Plaintiffs argue that there is no reason to require the helicopter to contact water in order for it to be salvable property, and that PHI's distinction is a dangerous proposition for a future aircraft pilot who might be refused landing privileges on a vessel simply because a water "landing" or ditching is required first for a salvage award.[130] Here, Plaintiffs contend, the helicopter landed and was temporarily stowed on the Vessel, similar to cargo, which is considered maritime property even if it remains dry, and was transported by the Vessel through navigable waters where it was safely discharged, like cargo.[131]

Next, Plaintiffs aver that PHI's reliance on *Historic Aircraft Recovery Corp. v. Wrecked & Abandoned Voight F4U-1 Corsair Aircraft*, a District of Maine case, is "totally misplaced and the case is not controlling in this district."[132] Plaintiffs argue that the court in *Historic Aircraft* determined that there could be no salvage of a military aircraft found in a lake in Maine, because the lake did not constitute "navigable waters," and thus the case was about jurisdiction, not salvage.[133] Here, Plaintiffs argue, it is undisputed that the Gulf of Mexico constitutes navigable

---

[128] *Id.*

[129] *Id.* at pp. 7–8.

[130] *Id.* at p. 8.

[131] *Id.*

[132] *Id.* (citing 294 F. Supp. 2d 132, 139 (D. Me. 2003)).

[133] *Id.*

waters.[134] Plaintiffs also dispute PHI's argument that rendering a salvage award in this case would open the door for vessel or rig owners to assert a salvage claim every time a helicopter landed due to low fuel, storms, or operational concerns, arguing that those are planned landings on stationary ships or rigs, which expect landings in the normal course of business.[135]

Next, Plaintiffs argue that, based on PHI's own admissions, Cole's deposition testimony, and the "obvious facts" surrounding the helicopter's forced landing on the Vessel, a reasonable fact finder could conclude that the helicopter was in danger when it made an emergency landing on the Vessel.[136] Plaintiffs cite *Sullivan v. General Helicopters, International*, in which they claim that a court in the District of Maryland declined to dismiss a case where the plaintiffs used a truck-mounted crane to move a disabled helicopter from the loading ramp of a vessel docked in port.[137] There, Plaintiffs allege, the helicopter was unsecured on the vessel's ramp and exposed to high winds at the time the plaintiffs arrived on the scene.[138] Plaintiffs aver that the court denied the defendants' motion to dismiss for failure to plead facts supporting that the helicopter faced a marine peril, reasoning that the allegations raised a plausible inference that, but for the plaintiffs' assistance, the helicopter might have been swept into the water.[139] Here, Plaintiffs aver, there are similarly genuine issues of fact regarding whether the helicopter was faced with a reasonable apprehension of danger when it landed on the Vessel during high winds and when the Vessel transported the

---

[134] *Id.* at pp. 8–9.

[135] *Id.* at p. 9.

[136] *Id.*

[137] *Id.* (citing 564 F. Supp. 2d 496 (D. Md. 2008)).

[138] *Id.*

[139] *Id.*

helicopter to port for discharge.[140] Furthermore, Plaintiffs contend, "there can be no logical dispute that the risk of ditching the helicopter and losing property and life in the Gulf of Mexico is a marine peril."[141]

Next, Plaintiffs argue that the Vessel and her crew voluntarily rendered salvage assistance to the helicopter and its crew and passengers, as the Vessel and her crew "had no choice because of the unusual circumstances."[142] According to Plaintiffs, PHI took over the ship when the helicopter landed, "but the vessel crew did not throw the helicopter overboard, demand it fly off, dump [it] off the hatch cover, refuse to tie it down, or imprison the pilots and passengers."[143] Therefore, Plaintiffs aver, they voluntarily accepted the landing of the helicopter and gave its pilots and passengers refuge.[144] In fact, Plaintiffs claim, if the Court believes Cole's "implausible story" that he flew over the ship to alert it, rather than to determine how to land, then Plaintiffs assented to the landing, which is a voluntary act.[145] Plaintiffs contend that PHI is attempting to "take advantage of its own lack of notice to the vessel" by arguing the Vessel did not change her course or come to a standstill, and that it would surely have given permission to land had the helicopter pilot radioed the Vessel prior to landing.[146] Therefore, Plaintiffs argue, they voluntarily assented after the helicopter landed without notice, and voluntarily instructed the Vessel's master and crew to transport the helicopter,

---

[140] *Id.* at p. 10.

[141] *Id.*

[142] *Id.*

[143] *Id.*

[144] *Id.*

[145] *Id.*

[146] *Id.* at pp. 10–11.

pilots and mechanics to the port for the helicopter's discharge and disembarkation, which they did.[147]

Plaintiffs also contend that, as Vessel owners, they have a right to claim a salvage award because the Vessel was at risk of being damaged by the emergency helicopter landing.[148] Plaintiffs aver that PHI is incorrect in its assertion that the Court must distinguish between the owners of vessels and the master and crew when making a salvage award; instead, Plaintiffs claim, the Fifth Circuit has clearly stated in *Platoro, Ltd. v. Unidentified Remains of Vessel, etc.* that "[t]he total award must include the contributions of all co-salvors."[149] Plaintiffs argue that there is no requirement that all potential salvors join as plaintiffs to recover an award under either the Salvage Convention or traditional general maritime law.[150] Both, Plaintiffs contend, contemplate that the party seeking a salvage award may be only the salving vessel's owner.[151] Likewise, Plaintiffs claim, under *The Blackwall*, "[s]alvors are not deprived of a remedy because another set of salvors neglect or refuse to join in the suit, nor will such neglect or refusal benefit the libellants by giving them any claim to a larger compensation, as the non-prosecution by one set of salvors enures, not to the libellants prosecuting the claim, but to the owners of the property saved."[152] In other words, Plaintiffs claim, to the extent that a plaintiff in an in rem action was assisted in performing the salvage, the portion of the total salvage award it receives should be reduced proportionately.[153]

---

[147] *Id.* at p. 11.

[148] *Id.*

[149] *Id.* (citing 695 F.2d 893, 904 n.15 (5th Cir. 1983)).

[150] *Id.*

[151] *Id.*

[152] *Id.* at p. 12 (quoting 77 U.S. 1, 12 (1870)).

[153] *Id.* (citing *R.M.S. Titanic, Inc. v. Wrecked & Abandoned Vessel*, 323 F. Supp. 2d 724, 742–43 (E.D. Va. 2004), *vacated and remanded on other grounds*, 435 F.3d 521, 538 (4th Cir. 2006)).

Here, Plaintiffs allege, the Vessel as a whole was exposed to the danger of a crash-landing helicopter, and the fact that the Vessel was not ultimately damaged does not prohibit Plaintiffs' salvage claim.[154] Plaintiffs argue that the Vessel's equipment was involved in lashing the helicopter and providing a safe landing platform, the Vessel's stores were used to accommodate and make the helicopter crew comfortable, the Vessel provided sleeping accommodations for the pilots and mechanics overnight, the Vessel's crew assisted in stowing the helicopter and comforted the pilots and passengers, and the Vessel as a whole transported the helicopter into port.[155] Thus, Plaintiffs contend, the Court may decide the amount of the total award, based on the entire salvage operation, as well as whether or how to apportion it among co-salvors.[156]

Finally, Plaintiffs argue that the 1989 Salvage Convention became the law of the land in the United States on July 14, 1996.[157] According to Plaintiffs, the Salvage Convention applies to any judicial or arbitral proceedings regarding salvage brought in the United States.[158] Furthermore, Plaintiffs claim, Article 1(c) of the Salvage Convention defines property to mean "any property not permanently and intentionally attached to the shoreline and includes freight at risk."[159] Plaintiffs argue that a helicopter is obviously not permanently and intentionally attached to the shoreline, and therefore plainly fits within the Convention's definition of salvageable property.[160] Furthermore,

---

[154] *Id.*

[155] *Id.*

[156] *Id.* at pp. 12–13.

[157] *Id.* at p. 13 (citing Martin Davies, *Whatever Happened to the Salvage Convention 1989?*, 39 J. Mar. L. & Com. 463 (2008)).

[158] *Id.* (citing Salvage Convention art. 2).

[159] *Id.*

[160] *Id.*

Plaintiffs claim, Article 1(a) of the Convention defines salvage operations widely to include any form of assistance to vessels or other property in danger in navigable waters.[161] Therefore, Plaintiffs claim, they have carried their burden to show that there are disputed issues of material fact sufficient to withstand summary judgment on both its general maritime and Salvage Convention claims, "especially at this early stage when only one witness has been deposed."[162]

### C.    Defendant's Arguments in Further Support of Partial Summary Judgment

In reply, PHI argues that Plaintiffs have erroneously characterized the purely legal issues in this case as issues of fact.[163] According to PHI, the Court faces three legal issues that may be resolved on a motion for summary judgment: (1) whether the helicopter constitutes "property" that can be the subject of marine salvage; (2) whether the in-flight vibration detected aboard the aircraft constituted a "marine peril"; and (3) whether Plaintiffs, as owners of the Vessel upon which the helicopter landed, acted as "voluntary salvors" as defined by maritime law.[164] PHI also disputes that the Salvage Convention applies "to the exclusion of the general maritime law," but argues that Plaintiffs nevertheless cannot make out a claim for salvage under either the Salvage Convention or general maritime law.[165]

Next, PHI argues that although Plaintiffs claim that additional testimony of Plaintiffs' own trial witnesses is necessary in order for the Court to decide whether Plaintiffs are entitled to salvage under these circumstances, as a matter of law, Plaintiffs cannot make out a claim for salvage even

---

[161] Id.

[162] Id. at p. 14.

[163] Rec. Doc. 32 at p. 1.

[164] Id.

[165] Id. at p. 2 n.1.

under the facts most favorable to Plaintiffs.[166] PHI avers that Plaintiffs rely in large part on the anticipated testimony of their own witnesses, as set forth in their answers to interrogatories, in an attempt to create issues of fact by focusing on the extent of potential danger faced by the helicopter.[167] However, PHI argues, Plaintiffs' "evidence" is presented in the form of inadmissible hearsay, via unsworn summaries of what Plaintiffs claim their witnesses may say at trial.[168] PHI, by contrast, avers that it has offered the sworn testimony of its pilot, Dean Cole, to establish the circumstances under which he decided to make the precautionary landing on the Vessel.[169]

Furthermore, PHI claims, it is clear that the helicopter did not face a marine peril and that it is not the proper subject of marine salvage.[170] PHI criticizes Plaintiffs' reliance on *Sullivan v. General Helicopters, International*, a case from the District of Maryland, which PHI argues is not controlling in this district and is distinguishable on several grounds.[171] According to PHI, in *Sullivan*, the plaintiffs responded to a request from a group of stevedores to remove a helicopter being transported as cargo from the ramp of a docked vessel.[172] There, PHI argues, the plaintiffs brought a claim for salvage after failing to be paid for their services, and the defendants moved to dismiss on jurisdictional grounds.[173] According to PHI, the court in *Sullivan* determined that it had maritime

---

[166] *Id.* at p. 2.

[167] *Id.*

[168] *Id.*

[169] *Id.*

[170] *Id.*

[171] *Id.* at pp. 2–3 (citing 564 F. Supp. 2d 496 (D. Md. 2008)).

[172] *Id.* at p. 3.

[173] *Id.*

jurisdiction because the helicopter was being transported as ship's cargo and was sitting on the loading ramp of the vessel when the salvage operation began.[174] PHI contends that the court noted that "cargo over navigable waters is the proper subject of a marine salvage award."[175] PHI argues that the court then moved on to the merits of the salvage claim and found that the element of "marine peril" had been sufficiently pled because, among other things, the helicopter, as cargo, was unsecured and was exposed to high winds and the risk of falling overboard.[176]

Here, PHI argues, the helicopter was not cargo that had been placed aboard the Vessel or entrusted to another carrier for transportation.[177] PHI claims that no court has ever held that an operational aircraft that lands on the deck of a vessel under its own power is marine property subject of salvage.[178] Furthermore, PHI contends, the helicopter in the instant case was faced with mechanical vibration of unknown origin while in flight, a condition that is wholly unique to aircraft and cannot be classified as a "marine peril."[179]

Next, PHI avers, Plaintiffs have simultaneously argued that the assistance in this case was voluntary, but also that the Vessel and her crew had "no choice" but to assist under the circumstances.[180] PHI argues that Plaintiffs have also claimed, however, that because the Vessel crew refrained from acting criminally toward the aircraft and her passengers after landing aboard

---

[174] *Id.*

[175] *Id.* (citing *Sullivan*, 564 F. Supp. 2d at 500 n.2 (citing *The SABINE*, 101 U.S. 384 (1879))).

[176] *Id.*

[177] *Id.*

[178] *Id.* at pp. 3–4.

[179] *Id.* at p. 4.

[180] *Id.*

the Vessel, their assistance was rendered voluntarily.[181] PHI contends that Plaintiffs have thus taken a "very liberal view of salvage," encompassing instances when the "salvor" could do harm, but refrains from doing so.[182] PHI contends that compensation as salvage is a reward given for perilous services, voluntarily rendered, and as an inducement to seamen to embark in such undertakings, not as an inducement for seamen to refrain from acting criminally when confronted with an opportunity.[183]

Next, PHI avers that the Vessel owners' right to a salvage award depends on whether a peril was ever posed to their property.[184] PHI cites *The Clarita*, an 1874 Supreme Court case, for the proposition that suitors must be prepared to show that the undertaking involved risk and enterprise, which Plaintiffs cannot do.[185] According to PHI, there is no evidence that the Vessel was ever in danger or risk of physical damage, let alone that Plaintiffs voluntarily undertook such a risk.[186] PHI contends that the aircraft landed on the Vessel's designated helipad, which is a proper and safe location for a helicopter to land on the Vessel.[187] PHI argues that the Vessel's crew initially believed it was a U.S. Coast Guard helicopter landing on the Vessel to conduct a routine inspection, and that Plaintiffs' conclusory statement that the Vessel "was exposed to the danger of a crash-landing helicopter" is unsupported by evidence, is inaccurate, and is insufficient to prove that Plaintiffs, as

---

[181] *Id.*

[182] *Id.*

[183] *Id.* at pp. 4–5.

[184] *Id.* at p. 5.

[185] *Id.* at n.2.

[186] *Id.* at p. 5.

[187] *Id.*

Vessel owners, ever put their property at risk.[188]

Finally, PHI argues, its motion for partial summary judgment is not premature, as the incident giving rise to Plaintiffs' claim took place nearly three years ago, and Plaintiffs filed their verified complaint in March 2015.[189] PHI contends that although the deadline to complete the Rule 30(b)(6) depositions of Plaintiffs, as well as depositions of Plaintiffs' chief mate and PHI's co-pilot, have been extended, the discovery that Plaintiffs allegedly need, such as the testimony from the Vessel crew, involves witnesses under their exclusive control.[190] PHI argues that Plaintiffs' decision not to obtain such testimony should not be used against PHI.[191]

### III. Law and Analysis

**A.**    ***Legal Standard on a Motion for Summary Judgment***

Under Federal Rule of Civil Procedure 56(a), when the pleadings and evidence demonstrate that no genuine dispute exists as to any material fact, the moving party is entitled to judgment as a matter of law, and summary judgment should be granted.[192] When assessing whether a dispute as to any material fact exists, a court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence."[193] All reasonable inferences are drawn in favor of the nonmoving party, but "unsupported allegations or affidavits setting forth 'ultimate

---

[188] *Id.*

[189] *Id.*

[190] *Id.*

[191] *Id.*

[192] Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986); *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).

[193] *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398–99 (5th Cir. 2008).

or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment."[194] If the record, as a whole, could not lead a rational trier of fact to find for the non-moving party, then no genuine issue of fact exists and the moving party is entitled to judgment as a matter of law.[195]

On a motion for summary judgment, the moving party bears the initial burden of identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact.[196] Where the non-moving party bears the burden of proof at trial, as here, the party moving for summary judgment may meet its burden by showing the Court that there is an absence of evidence to support the non-moving party's case.[197] Thus, if the moving party satisfies its initial burden, the burden shifts to the nonmoving party to "identify specific evidence in the record, and articulate" precisely how that evidence supports her claims.[198]

In doing so, the non-moving party may not rest upon mere allegations or denials in its pleadings, but rather must set forth "specific facts showing the existence of a 'genuine' issue concerning every essential component of its case."[199] Likewise, unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary-judgment proof.[200] Federal Rule of Civil Procedure 56 does not impose on the Court a duty to "sift through the record

---

[194] *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985);  *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

[195] *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986).

[196] *Celotex*, 477 U.S. at 323.

[197] *Id.* at 325.

[198] *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994), *cert. denied*, 513 U.S. 871 (1994); *see also Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998).

[199] *Morris*, 144 F.3d at 380 (citing *Thomas v. Price*, 975 F.2d 231, 235 (5th Cir. 1992); *see also Bellard v. Gautreaux*, 675 F.3d 454, 460 (5th Cir. 2012).

[200]  *See Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994).

in search of evidence" to support the nonmovant's opposition;[201] the burden to identify such evidence remains wholly on the nonmovant.[202] Hearsay evidence and unsworn documents that cannot be presented in a form that would be admissible in evidence at trial do not qualify as competent opposing evidence.[203]

There is no genuine issue for trial "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."[204] The court need not consider disputed fact issues which are "irrelevant and unnecessary."[205] If the nonmovant fails to make a showing sufficient to establish the existence of a factual dispute regarding an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted.[206]

## B.   *Applicable Law on Salvage Awards*

"The law of marine salvage is of ancient vintage. In contrast to the common law, which does not grant a volunteer who preserves or saves the property of another any right to a reward, a salvor of imperiled property on navigable waters gains a right of compensation from the owner."[207] "Because of the peculiar dangers of sea travel, public policy has long been held to favor a legally enforced reward in this limited setting, to promote commerce and encourage the preservation of

---

[201] *Ragas*, 136 F.3d at 458; *see also Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915–16 & n.7 (5th Cir. 1992).

[202] *Skotak*, 953 F.2d at 916 n.7.

[203] *Martin v. John W. Stone Oil Distrib., Inc.*, 819 F.2d 547, 549 (5th Cir. 1987); Fed. R. Civ. P. 56(c)(2).

[204] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) (citing *First Nat. Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288–89 (1968)).

[205] *Id.*

[206] *Celotex*, 477 U.S. at 322–23.

[207] 2 Thomas J. Schoenbaum, *Admiralty and Maritime Law* § 16-1 (5th ed. 2015) (footnote omitted); *see also Mason v. The Blaireau*, 6 U.S. 240, 266 (1804) (Marshall, J.) (noting that, although it is true that when property on land exposed to grave peril is saved by a volunteer, no remuneration is given, "[l]et precisely the same service, at precisely the same hazard, [b]e rendered at sea, and a very ample reward will be bestowed in the courts of justice").

valuable resources for the good of society."[208] An award of salvage is generally appropriate when property is successfully and voluntarily rescued from marine peril.[209]

To succeed on a salvage claim, a plaintiff must prove three elements: (1) that the property faced a marine peril; (2) voluntary service was rendered when not required as an existing duty or from a special contract; and (3) the salvage attempt succeeded in whole or in part, or contributed to the success of the operation.[210] Whether a marine peril exists is a question of fact.[211] The peril necessary to constitute a salvage service need not be one of imminent and absolute danger; the danger must simply be present or reasonably to be apprehended.[212] "The burden of proof that the vessel or property is in peril is upon the one claiming a salvage award."[213] Voluntariness is also ordinarily an issue of fact.[214] Here, PHI does not dispute the success of the operation, the third element of a salvage claim.

## C.    Analysis

Before even reaching the three elements of a salvage claim, PHI urges the Court to find that, as a matter of law, the Vessel owners are not the proper parties to claim a salvage award in this matter, and the helicopter in the instant matter is not property subject to a salvage award. The Court will examine each argument in turn before assessing the elements of a salvage claim.

---

[208] *Margate Shipping Co. v. M/V JA Orgeron*, 143 F.3d 976, 984 (5th Cir. 1998) (citing *B.V. Bureau Wijsmuller v. United States*, 702 F.2d 333, 337 (2d Cir. 1983)).

[209] *The Sabine*, 101 U.S. 384 (1880).

[210] *United States v. EX-USS CABOT/DEDALO*, 297 F.3d 378, 381 (5th Cir. 2002) (citing *Nunley v. M/V Dauntless Colocotronis*, 863 F.2d 1190, 1199 (5th Cir. 1989)).

[211] *See Evanow v. M/V Neptune*, 163 F.3d 1108, 1114 (9th Cir. 1998) (citing *Clifford v. M/V Islander*, 751 F.2d 1, 5 (1st Cir. 1984)).

[212] *See Fort Myers Shell & Dredging Co. v. Barge NBC 512*, 404 F.2d 137, 139 (5th Cir. 1968).

[213] 3A *Benedict on Admiralty* § 63; *see also Am. Home Assurance Co. v. L & L Marine Serv., Inc.*, 875 F.2d 1351, 1355 (8th Cir. 1989) (citing *Clifford*, 751 F.2d at 6).

[214] *EX-USS CABOT/DEDALO*, 297 F.3d at 381–82.

### 1.  Party Asserting a Salvage Claim

In an argument that is collateral to the elements of a salvage claim and akin to the requirement that a plaintiff have "standing," PHI claims that Plaintiffs, as the Vessel's owners, do not have a right to claim salvage in this matter.[215] PHI claims that a shipowner may only share in a salvage award if it appears that the shipowner's property was actually risked or at least at risk of being affected.[216] Here, PHI contends, Plaintiffs cannot show how a helicopter, under the control of its pilots and making a precautionary landing, posed an imminent and serious risk to their property.[217] Furthermore, PHI argues, even if it were assumed that the master and crew provided salvage services, neither the crew nor master were joined as plaintiffs.[218] According to PHI, although all those who render service in a salvage operation may share in an award,[219] Plaintiffs may not step in the shoes of the crew for purposes of obtaining a salvage award, and may only recover an award based on their own voluntary contribution and potential risk to their property from the salvage operation, which here was non-existent.**[220]**

In response, Plaintiffs contend that, as Vessel owners, they have a right to claim a salvage award under general maritime law because the Vessel was at risk of being damaged by the emergency helicopter landing.[221] Plaintiffs aver that the Court need not distinguish between the owners of vessels and the master and crew when making a salvage award.[222] Furthermore, Plaintiffs

---

[215]  *Id.* at p. 15.

[216]  *Id.* (citing Martin J. Norris, *The Law of Seamen* § 9:13 (4th ed. 1985)).

[217]  *Id.* at p. 16.

[218]  *Id.*

[219]  *Id.* (citing *St. Paul Marine Transp. Corp. v. Cerro Sales Corp.*, 505 F.2d 1115, 1117 (9th Cir. 1974)).

[220]  *Id.* at pp. 16–17.

[221]  Rec. Doc. 25 at p. 11.

[222]  *Id.*

argue that there is no requirement that all potential salvors join as plaintiffs to recover an award under either the Salvage Convention or traditional general maritime law.[223] Here, Plaintiffs allege, the Vessel's equipment was involved in lashing the helicopter and providing a safe landing platform, the Vessel's stores were used to accommodate and make the helicopter crew comfortable, the Vessel provided sleeping accommodations for the pilots and mechanics overnight, the Vessel's crew assisted in stowing the helicopter and comforted the pilots and passengers, and the Vessel as a whole transported the helicopter into port.[224]

The leading treatise on the law of admiralty, *Benedict on Admiralty*, clearly states that "[t]here is no limitation as to the type of person who may be entitled to a salvage award."[225] Instead, the treatise explains, the question of whether a person is eligible to receive a salvage reward is strongly tied to the question of whether a service was voluntarily rendered—which is already accounted for as an element of a salvage claim.[226] Nevertheless, however, PHI argues that as a matter of law, shipowners are precluded from sharing in a salvage award or bringing a claim without evidence that the shipowner's property was actually risked or at least at risk of being affected.[227]

Although it is a general rule that a party who does not participate in the salvage service is not entitled to a salvage award, an exception to the rule permits the owner of a salving vessel to share in the award,[228] even if the owner does not take part in, direct, or even know about the salvage

---

[223] *Id.*

[224] *Id.*

[225] 3A *Benedict on Admiralty* § 47.

[226] *Id.*

[227] Rec. Doc. 17-1 at p. 15 (citing Martin J. Norris, *The Law of Seamen* § 9:13 (4th ed. 1985)).

[228] 3A *Benedict on Admiralty* § 57 (citing *The Blackwall*, 77 U.S. 1 (1869); *The Camanche*, 75 U.S. 448 (1869)).

operation.[229] A salving owner is granted a salvage reward because of the risk and danger to which his property is exposed.[230] Furthermore, "[s]alvors are not deprived of a remedy because another set of salvors neglect or refuse to join in the suit, nor will such neglect or refusal benefit the libellants by giving them any claim to a larger compensation, as the non-prosecution by one set of salvors enures, not to the libellants prosecuting the claim, but to the owners of the property saved."[231] Thus, it is irrelevant here that the only plaintiffs bringing suit are the owner and manager of the Vessel; it is well-settled that no other would-be salvors need join a suit in order for the owners of a vessel to make a claim for salvage.

The parties dispute the degree of danger allegedly faced by the Vessel in receiving and transporting the helicopter, but PHI cites no authority in which an owner of a vessel that undoubtedly provided salvage services was denied a salvage award because the vessel in question faced an insufficient degree of danger. In support of its claims, PHI cites *The Blackwall* and *The Carmanche*, two 1869 Supreme Court decisions that stated, in rebutting arguments to the contrary, that vessel owners could indeed recover salvage awards based on the premise that their vessels bore some risk in providing salvage services.[232] The Supreme Court's pronouncements in those two cases recognized that, as a matter of policy, vessel owners were also entitled to potentially claim a salvage award, rather than limiting the circumstances in which an owner can claim an award to those of

---

[229] *DOROTHY J v. City of New York*, 749 F. Supp. 2d 50, 77 (E.D.N.Y. 2010).

[230] *The Blackwall*, 77 U.S. at 13 ("Beyond doubt remuneration for salvage service is awarded to the owners of vessels on account of the danger to which the service exposes their property, and the risk which they run of loss in suffering their vessels to engage in such perilous undertakings, but it is not admitted that the amount of the allowance must be reduced on that ground. Corporations, as the owners of vessels, whether sail-vessels or steamers, may promote a salvage suit, and it makes no difference in that respect whether they were present or absent, provided it appears that the vessel employed was well manned and equipped for the service.").

[231] *Id.* at 12.

[232] *See id.* at 13; *The Carmanche*, 75 U.S. at 448.

especially great risk to a vessel. Other courts have expressed additional policy interests, besides danger to a vessel, that would justify a salvage award to vessel owners, including discouraging masters of vessels from abusing their authority or unreasonably risking the safety of a vessel in order to pursue selfish gains,[233] and to compensate an owner for the expenses of the rescue mission, including the wages of the crew, fuel, and provisions.[234]

A more recent case in the Ninth Circuit, *Bartholomew v. Crowley Marine Services, Inc.*, expressed a similar view to that espoused by PHI, noting that "it has been considered a general, if not universal, rule that the reward is available not only to the salvors but also to the owner of the salving vessel, if there was a risk that the vessel could be affected during the salvage operation."[235] However, the degree of risk borne by a vessel and its crew is usually better assessed in considering the size of a salvage award and how it should be appropriated between salvors, rather than whether one is warranted at all.[236] In *DOROTHY J v. City of New York*, a judge in the Eastern District of New York summarized the law, adhered to across circuits, as follows:

> The owner need not take part in, direct, or even know about the salvage operation, to share in the award, although such participation or direction may increase the owner's proportionate share. . . . An owner's share generally increases when the salving vessel is of large value, when the salving vessel or owner was exposed to substantial risk in rendering the services . . . when the princip[al] service was performed by the vessel, . . . or when the owner directed the service . . . . In contrast, the share apportioned to the crew generally increases when the risk sustained by the crew was exceptionally high, the salving vessel was not exposed to serious risk or danger . . . or where the efficiency of the salvage vessel itself played a small role in

---

[233] *The Nathaniel Hooper*, 17 F. Cas. 1185, 1200 (C.C.D. Mass. 1839).

[234] *The Missouri*, 17 F. Cas. 484, 489 (D. Mass. 1854) ("The whole service was co-ordinate. The men could not act without the ship, nor the ship without the men. The right to salvage accrues from the use of the vessel.").

[235] *Bartholomew v. Crowley Marine Servs., Inc.*, 337 F.3d 1083, 1088 (9th Cir. 2003), *as amended* (Sept. 12, 2003).

[236] *See DOROTHY J v. City of New York*, 749 F. Supp. 2d 50, 77 (E.D.N.Y. 2010)

the services rendered relative to the individual efforts of the crew . . . .[237]

Here, Plaintiffs have argued that the helicopter was emitting smoke and making loud noises as it approached the Vessel.[238] Therefore, contrary to PHI's argument, a finder of fact could therefore find, if Plaintiffs submit evidence on that matter,[239] that the Vessel faced a danger that the helicopter could cause a fire or some other harm to the Vessel when the helicopter landed aboard the Vessel.

Furthermore, courts have granted salvage awards to salving vessel owners without evidence that the salving vessels faced significant risks. For example, in *Dorothy J v. City of New York*, a judge concluded that a tugboat owner was entitled to a salvage award where the tugboat and its crew provided successful salvage service to a city-owned ferry by arriving alongside the ferry ready to provide potential rescue or other assistance following the ferry's allision with a pier.[240] Similarly, the Ninth Circuit in *Saint Paul Marine Transportation Corp. v. Cerro Sales Corp.* rejected arguments similar to PHI's in a case where crew members went aboard a burning ship to rescue cargo, finding that both the salving vessel's owner and crew members who did not board the burning ship were entitled to a salvage award.[241] There, the court stated, "All who render service in a salvage operation may share in an award. Each individual need not actively participate by manning the small boats, boarding the salved vessel or fighting fires. . . . Every man's duties on the salving ship contribute to the property salvage and the law extends a portion of the award to even a 'scullion in

---

[237] *Id.* (citing *The Camanche*, 75 U.S. 448, 461, 470, 472–73; *Conekin v. Lockwood*, 231 F. 541, 544–45 (E.D.S.C. 1916); *Cape Fear Towing & Transp. Co. v. Pearsall*, 90 F. 435, 439 (4th Cir. 1898); *Markham v. Simpson*, 22 F. 743, 744 (S.D.N.Y. 1884)).

[238] Rec. Doc. 25 at p. 3.

[239] On January 12, 2016, the Court granted the parties' joint motion to extend deadlines to complete the Federal Rule of Civil Procedure 30(b)(6) deposition of Plaintiffs, a deposition of Chief Mate Spyridon Panagiotoplous, and PHI pilot Joshua Brackett. Rec. Doc. 24.

[240] *DOROTHY J v. City of New York*, 749 F. Supp. 2d 50, 65 (E.D.N.Y. 2010).

[241] 505 F.2d 1115, 1117 (9th Cir. 1974).

the galley peeling potatoes while the actual salvage work is going on.'"[242]

Therefore, the Court concludes that the crew need not join the suit in order for the Vessel owners to pursue a claim, and the Vessel need not have faced significant risk of damage in order to allow the Vessel owners to seek a salvage award in this matter. Alternatively, a genuine, disputed issue of material fact exists concerning whether the helicopter posed such a risk to the Vessel, precluding summary judgment on this issue.[243]

### 2.      Property Subject to Salvage Award

Next, PHI argues that, as a matter of law, a helicopter is not the kind of property that may be subject to a salvage award. Although the kind of property at issue is not a formal element of a salvage claim, courts have often discussed whether salvage awards are limited only to the salvage of vessels or goods coming from a vessel.[244] Courts have struggled with the question of whether the law of salvage even applies at all to non-vessel property, including cargo, freight, and aircraft.[245] Indeed, "[t]he issue of whether an aircraft recovered in navigable waters is properly the subject of a salvage award remains unsettled."[246] In such cases, before courts even reach the elements of a salvage claim, the question of whether an aircraft is properly the subject of an award is often determined first by examining whether the aircraft was sufficiently "maritime" such as to invoke

---

[242] *Id.* (quoting *The Centurion*, 1 Ware 490 (D. Me. 1839)).

[243] The Court shall address PHI's concerns regarding evidence submitted by Plaintiffs, and the existence of any genuine, disputed issues of material fact, below.

[244] 3A *Benedict on Admiralty* § 32.

[245] *See id.* at §§ 32–38.

[246] *Id.* at § 38.

admiralty jurisdiction.[247] The question also arises in situations where jurisdiction is not at issue.[248] Therefore, the cases suggest that although proving that property is the proper subject of a salvage award is not a traditional element of a salvage claim, where a party alleges that the recovery of certain property, as a matter of law, cannot lead to a salvage award, courts examine that preliminary question separately from evaluating the elements of a salvage claim.

Here, PHI argues that historically, property subject to a claim of salvage has included vessels, property aboard vessels, property thrown overboard or jetsam, property found freely floating on the sea or flotsam, property on the sea attached to buoys, and property washed up to shore—in other words, property with a "strong maritime nexus."[249] PHI avers that courts have extended claims of salvage to non-vessel property recovered in navigable waters only in cases that are "extremely rare and the exception to the rule," and only where property was derelict, lost, or otherwise "abandoned" and the salvor took affirmative action to recover the property.[250]

In response, Plaintiffs argue that under PHI's reasoning, Plaintiffs would only have a salvage claim if the helicopter had crashed into the water and the Vessel then hoisted the helicopter onto the deck.[251] Plaintiffs argue that there is no reason to require the helicopter to contact water in order for it to be salvable property, and that PHI's distinction is a dangerous proposition for a future aircraft

---

[247] *Id.*; *see also The Crawford Bros. No. 2*, 215 F. 269 (W.D. Wash. 1914); *Matter of Reinhardt v. Newport Flying Serv. Corp.*, 232 N.Y. 115 (1921); *Lambros Seaplane Base, Inc. v. The Batory*, 215 F.2d 228 (2d Cir. 1954).

[248] *See, e.g.*, *Broere v. Two Thousand One Hundred Thirty-Three Dollars*, 72 F. Supp. 115, 116 (E.D.N.Y. 1947) (holding that money found on a body floating in navigable waters could be the subject of salvage, despite arguments to the contrary); *Tidewater Salvage, Inc. v. Weyerhaeuser Co.*, 633 F.2d 1304, 1306 (9th Cir. 1980) (stating as a matter of law, before addressing the question of marine peril, that "[u]nattended logs floating in navigable waters are subject to the law of salvage.").

[249] Rec. Doc. 17-1 at p. 6.

[250] *Id.* at p. 8.

[251] Rec. Doc. 25 at pp. 7–8.

pilot who might be refused landing privileges on a vessel simply because a water "landing" or ditching is required first for a salvage award.[252] Plaintiffs compare the helicopter to cargo, which is unquestionably subject to salvage awards and which can, like the helicopter, be temporarily stowed on a vessel and transported through navigable waters until safely discharged.[253]

Plaintiffs rely on the broad definition of salvageable "property" provided by the Salvage Convention, which states that "[p]roperty means any property not permanently and intentionally attached to the shoreline and includes freight at risk."[254] Under that definition, it is clear that a helicopter, which is not permanently attached to the shoreline, would constitute salvageable property under the Salvage Convention, even if not necessarily under general maritime law, and the inquiry regarding whether a helicopter can be salvaged could end there. PHI, however, "disputes [the Salvage Convention's] applicability to the exclusion of the general maritime law."[255] PHI has not made any argument that the Salvage Convention's definition of "property" should exclude a helicopter, and instead seemingly claims that, because the Salvage Convention is "rarely mentioned by U.S. courts" and "retains most of the essential features of traditional salvage law," the outcome here should not change based on the Salvage Convention.

PHI is correct that the Salvage Convention, which was ratified by the U.S. Senate in 1991 and effectively became part of the law of the United States in 1996, is mentioned only occasionally in briefs and rarely in published opinions.[256] The Fifth Circuit has declined to determine whether the

---

[252] *Id.* at p. 8.

[253] *Id.*

[254] Salvage Convention, art. 1(c).

[255] Rec. Doc. 32 at p. 2 n.1.

[256] *See* Martin Davies, *Whatever Happened to the Salvage Convention 1989?*, 39 J. MAR. L. & COM. 463, 464 (2008); *see also* Jonathan Joseph Beren Segarra, *Above Us the Waves: Defending the Expansive Jurisdictional Reach of American Admiralty Courts in Determining the Recovery Rights to Ancient or Historic Wrecks*, 43 J. MAR.

general maritime law survives the adoption of the Salvage Convention, but in *Solana v. GSF Development Driller I*, the court assumed without deciding that general maritime principles continue to apply because, in the case at bar, the result would have been the same under either the treaty or general maritime law.[257] A review of the few cases that have invoked the Salvage Convention reveals at least one other example in which a court side-stepped the question of the Salvage Convention's applicability by determining that the outcome would remain unchanged regardless of the source of law,[258] as well as several examples where courts have adopted the language of the Salvage Convention and accepted its applicability.[259]

Although the Salvage Convention indeed appears to be often ignored, PHI presents the Court with no argument or reason why the treaty, which was ratified by the U.S. Senate in 1991 and effectively became part of the law of the United States in 1996, should not be regarded as the supreme law of the land. However, as the question of the Salvage Convention's applicability appears to remain an open question, as indicated by the Fifth Circuit in *Solana*, the Court will also consider whether the helicopter in question is property subject to a salvage award under general maritime law.

PHI urges the Court to conclude that a helicopter is not salvageable property because it lacks a sufficient "maritime nexus." "In order for a court to make a salvage award, there should be a nexus

---

L. & Com. 349, 384 (2012) ("[The Convention] is entitled to be treated as 'the supreme law of the land' in the United States, although it has been strangely ignored by the majority of American admiralty courts.").

[257] *Solana v. GSF Dev. Driller I*, 587 F.3d 266, 270 (5th Cir. 2009); *see also id.* at 272 ("We will assume, but we stress that we are not deciding, that the Convention is enforceable in this nation's courts . . . .").

[258] *Port Everglades Launch Serv., Inc. v. M/Y SITUATIONS*, No. 10-60571, 2011 WL 1196017, at *7 n.4 (S.D. Fla. Mar. 29, 2011).

[259] *See, e.g., Tow Tell Marine Serv., LLC v. M/V 28' SPENCER*, No. 13-20488, 2013 WL 6212192, at *3 (S.D. Fla. Nov. 27, 2013); *In re Mielke*, No. 10-13519, 2013 WL 5913681, at *6 (E.D. Mich. Nov. 1, 2013); *DOROTHY J v. City of New York*, 749 F. Supp. 2d 50, 63, 70 (E.D.N.Y. 2010) (referring to the Salvage Convention as "rephras[ing]" and "adopt[ing], although not in identical language," concepts of the general maritime law of salvage).

between the item salvaged and traditional maritime activities."[260] Traditionally, salvage awards were restricted to objects with explicit connections to ships and vessels; in fact, in 1887, the Supreme Court noted that "no structure that is not a ship or vessel is a subject of salvage."[261] Since then, however, salvage awards have been awarded for the recovery of cargo and fuel,[262] and even to property such as seaplanes[263] and money found on a drowned human body.[264] On the other hand, the Eighth Circuit held in *Provost v. Huber* that a house that sank while being transported by truck over a frozen lake lacked a sufficient maritime relationship to warrant a salvage award.[265]

While the requirement for a "maritime nexus" has a long history, some judges have criticized, for more than a century, the "narrow and restricted doctrine of limiting the subject of salvage services to a ship or goods coming from a ship."[266] In 1871, a judge in the District of Massachusetts determined in *Fifty Thousand Feet of Timber* that two rafts of timber found floating in the Boston Harbor could be the subject of a salvage award, declaring that "[i]f the services are rendered, it is of no consequence whether the goods are a ship or part of a ship, or were ever on

---

[260] Robert Force, Fed. Judicial Ctr., *Admiralty and Maritime Law* 164 (2d ed. 2013).

[261] *Cope v. Vallette Dry-Dock Co.*, 119 U.S. 625, 627 (1887). The Supreme Court in the same opinion broadened its own pronouncement, however, and also stated that "[i]f we search through all the books, from the Rules of Oleron to the present time, we shall find that salvage is only spoken of in relation to ships and vessels and their cargoes, or those things which have been committed to or lost in the sea or its branches, or other public navigable waters, and have been found and rescued. It is true that the terms 'ships and vessels' are used, in a very broad sense, to include all navigable structures intended for transportation." *Id.* The Court further noted that items belonging to a ship or vessel, such as furniture and cargo, "clearly" may be the property of salvage, whereas property that has "no connection with a ship or vessel" had met with split authorities regarding whether they could be the subject of salvage. *Id.*

[262] *Allseas Mar., S.A. v. M/V Mimosa*, 812 F.2d 243, 248 (5th Cir. 1987).

[263] *Lambros Seaplane Base v. The Batory,* 215 F.2d 228 (2d Cir. 1954).

[264] *Broere v. Two Thousand One Hundred Thirty-Three Dollars*, 72 F. Supp. 115 (E.D.N.Y. 1947).

[265] *Provost v. Huber*, 594 F.2d 717 (8th Cir. 1979).

[266] 3A *Benedict on Admiralty* § 34.

board a ship."[267] Similarly, in 1879, a judge in the Eastern District of Virginia stated in *Maltby v. Steam Derrick Boat* that any property of value could be the subject of salvage provided that it was saved under conditions that gave rise to admiralty jurisdiction.[268] The test seemingly applied in other cases, *Maltby* concluded, was not whether the property saved was a vessel or its cargo, "but whether the thing saved is a movable thing, possessing the attributes of property, susceptible of being lost and saved in places within the local jurisdiction of the admiralty."[269]

PHI argues that the "bone-dry, land-based civilian helicopter" in this case, like the house in *Provost*, is the kind of non-vessel property that may not be the subject of a salvage claim.[270] Even where other courts have allowed the recovery of non-vessel property, PHI argues, those awards all involved "'non-marine' property [that was] derelict, lost, or otherwise 'abandoned' . . . in which the salvor took affirmative action to recover the property."[271] Here, however, PHI conflates two separate analyses: first, whether property has a sufficient maritime nexus such that it may be considered salvageable, and second, whether the property was in peril. For example, in *Lambros Seaplane Base, Inc. v. The Batory*, a case cited by PHI, the Second Circuit determined first, as a matter of law, that a seaplane was a marine object that could be subject to salvage.[272] In that analysis, the Second Circuit made no mention of the fact that the seaplane had been abandoned, and focused its inquiry solely on the question of whether the seaplane was a "vessel which is susceptible of salvage under

---

[267] 9 F. Cas. 47, 48 (D. Mass. 1871).

[268] 16 F. Cas. 564, 566 (E.D. Va. 1879).

[269] *Id.*

[270] Rec. Doc. 17-1 at p. 7.

[271] *Id.* at p. 8.

[272] 215 F.2d 228, 233 (2d Cir. 1954) ("On all the foregoing considerations, we sustain the ruling below that a seaplane when on the sea is a marine object which is subject to the maritime law of salvage.").

the maritime law."[273] Only after concluding that a seaplane was salvageable did the court turn to "whether the other necessary elements of salvage were proved," wherein the Second Circuit discussed the pilot's request for rescue and "that the pilot had no intention of voluntarily returning to the plane" as evidence that it was reasonable for the salvor to believe that the seaplane was in peril.[274] PHI attempts to import factors considered by courts in determining whether a marine peril was present into the test the court should adopt regarding whether property is a marine object subject to salvage, but it cites no case law to support such a requirement.[275]

PHI also points to the decision of a judge in the District of Maine, in *Historic Aircraft Recovery Corp. v. Wrecked & Abandoned Voight F4U-1 Corsair Aircraft*, which strongly questioned the extension of the law of maritime salvage to claims regarding even abandoned aircraft.[276] First, this Court notes that *Historic Aircraft Recovery*, which is not binding authority in this district, found that a military plane found in Sebago Lake, Maine was not the proper subject of a salvage award because the lake in which it was found was not navigable, and therefore not subject to admiralty jurisdiction.[277] The court went on to analyze, however, as PHI does in its briefing, the Supreme Court's decision in *Executive Jet Aviation v. City of Cleveland*.[278] There, the District of Maine interpreted *Executive Jet* as the Supreme Court "express[ing] its reluctance to extend admiralty

---

[273] *Id.* at 231.

[274] *Id.* at 233.

[275] The other cases cited by PHI for this proposition—*Matter of Reinhardt v. Newport Flying Serv. Corp.*, 232 N.Y. 115, 119, 133 N.E. 371 (1921) and *Int'l Aircraft Recovery L.L.C. v. Unidentified, Wrecked & Abandoned Aircraft*, 218 F.3d 1255, 1256–57, 1260 & n. 13 (11th Cir. 2000)—similarly, upon closer examination, fail to support PHI's argument.

[276] Rec. Doc. 17-1 at p. 8 (citing 294 F. Supp. 2d 132, 139 (D. Me. 2003)).

[277] *Historic Aircraft Recovery*, 294 F. Supp. 2d at 135.

[278] *Id.* at 139 (citing *Executive Jet Aviation v. City of Cleveland*, 409 U.S. 249 (1972)).

jurisdiction to matters involving aviation, at least in the context of torts."[279] In *Executive Jet*, where the plaintiffs sought to invoke the law of admiralty for federal jurisdiction purposes, the Supreme Court stated that the rules and concepts developed through long experience in admiralty law would be "wholly alien to air commerce, whose vehicles operate in a totally different element, unhindered by geographical boundaries and exempt from the navigational rules of the maritime road."[280] PHI relies on this language to urge this Court to conclude that "an aircraft which safely comes to rest on the designated helicopter landing location on a vessel, and never touches navigable water, is [not] property that may be the subject of a salvage award."[281]

Although *Executive Jet* expressed some reluctance to extend admiralty jurisdiction, at least in the context of torts, to matters involving aviation, *Executive Jet* involved a situation in which an airplane, upon striking a flock of seagulls as it was taking off, crashed into the navigable waters of Lake Erie on a flight intended to travel from Cleveland, Ohio to Portland, Maine and then to White Plains, New York — in other words, "a flight that would have been almost entirely over land [and] within the continental United States."[282] As such, the Supreme Court declined to extend admiralty jurisdiction in a situation "which is only fortuitously and incidentally connected to navigable waters and which bears no relationship to traditional maritime activity,"[283] stating that the Court could find "no significant relationship between such an event befalling a land-based plane flying from one point in the continental United States to another, and traditional maritime activity involving

---

[279] *Id.*

[280] *Executive Jet Aviation,* 409 U.S. at 270.

[281] Rec. Doc. 17 at p. 9.

[282] *Executive Jet Aviation*, 409 U.S. at 272.

[283] *Id.* at 273.

navigation and commerce on navigable waters."[284] The Court acknowledged that the situation might be different, however, if a plane flying from New York to London crashed in the mid-Atlantic, as an "aircraft in that situation might be thought to bear a significant relationship to traditional maritime activity because it would be performing a function traditionally performed by waterborne vessels."[285] Here, it is undisputed that the helicopter was flying on an outbound flight, toward a platform, over the Gulf of Mexico carrying two crew and seven passengers, and therefore "performing a function traditionally performed by waterborne vessels," namely ferrying passengers over navigable waters.[286]

Citing *Barger v. Petroleum Helicopters, Inc.*, a 1982 Fifth Circuit case, PHI also argues that the Fifth Circuit has clearly held that helicopters, unlike seaplanes, are not "vessels" for purposes of maritime commerce, even if they fly over the sea.[287] The helicopter need not be a "vessel," however, in order to bear a sufficient maritime nexus to warrant a salvage award. *Barger* held that a pilot of a helicopter that transported passengers to the Outer Continental Shelf was not a "seaman" for purposes of the Jones Act, and thus the exclusive remedy for his wrongful death claim against his employer was the Longshoremen's and Harbor Workers' Compensation Act.[288] *Barger* recognized, however, that *Smith v. Pan Air Corp.*, a Fifth Circuit opinion decided months prior, had held that a pilot of a helicopter that crashed into the Gulf of Mexico could sustain a wrongful death claim in admiralty against a third party under the Death on the High Seas Act.[289] Similarly, just two

---

[284] *Id.* at 272.

[285] *Id.* at 271.

[286] Rec. Doc. 17-4 at p. 1.

[287] Rec. Doc. 17-1 at p. 10 (citing 692 F.2d 337, 339–40 (5th Cir. 1982)).

[288] *Barger*, 692 F.2d at 338.

[289] *Id.* at 338–39 (citing *Smith v. Pan Air Corp.*, 684 F.2d 1102 (5th Cir.1982)).

years prior, the Fifth Circuit in *Ledoux v. Petroleum Helicopters, Inc.* stated in a short opinion that "[t]he crash of the deceased's helicopter, while it was being used in place of a vessel to ferry personnel and supplies to and from offshore drilling structures, bears the type of significant relationship to traditional maritime activity which is necessary to invoke admiralty jurisdiction."[290] As noted above, the situation cited in *Ledoux* is similar to the case at bar.

The Supreme Court came to the same conclusion in *Offshore Logistics, Inc. v. Tallentire*, a 1986 case in which the Court, citing *Executive Jet*, stated:

> [A]dmiralty jurisdiction is appropriately invoked here under traditional principles because the accident occurred on the high seas and in furtherance of an activity bearing a significant relationship to a traditional maritime activity. Although the decedents were killed while riding in a helicopter and not a more traditional maritime conveyance, that helicopter was engaged in a function traditionally performed by waterborne vessels: the ferrying of passengers from an "island," albeit an artificial one, to the shore.[291]

Thus, both the U.S. Supreme Court and the Fifth Circuit have recognized that a helicopter that transports passengers to an offshore platform engages in a function traditionally performed by waterborne vessels, and therefore bears a sufficient nexus to traditional maritime activity that admiralty jurisdiction may be invoked when accidents befall such helicopters. Although this Court recognizes that these decisions have arisen in cases examining the applicability of admiralty jurisdiction, rather than in addressing the law of salvage, this Court sees no reason, and PHI has not offered any, why the question of whether an activity "bear[s] a significant relationship to a traditional maritime activity"[292] should have a different outcome than the question of whether property "bears a strong maritime nexus." Therefore, the Court cannot agree with PHI that a

---

[290] 609 F.2d 824, 824 (5th Cir. 1980).

[291] 477 U.S. 207, 218–19 (1986) (citation omitted).

[292] *Id.*

helicopter that transports passengers to offshore platforms cannot be property that may be subject to a salvage award if recovered or saved in navigable waters.

Finally, PHI makes a policy argument that allowing a salvage claim in this case "would potentially open the door for vessel or rig owners to assert a claim for salvage every time a helicopter made a landing because of low fuel, storm activity or an operational concern," an outcome that would create an undesirable disincentive for a pilot to act prudently for fear of a salvage claim being asserted against the helicopter.[293] Plaintiffs respond that such landings are planned and occur on stationary ships or rigs, which expect landings in the normal course of business.[294]

The Court is not persuaded by PHI's claim. PHI ignores the fact that, even if its landing on the Vessel was precautionary in nature, PHI has admitted that its mechanics were unable to find any obvious reason for the helicopter's vibration when they examined it on the Vessel, and therefore they decided to return the helicopter to shore aboard the Vessel.[295] By contrast, when a helicopter lands on a vessel to refuel, or even due to storm activity, it is later able to leave the vessel of its own volition, without needing to be ferried to land. Although PHI argues that the helicopter here cannot be considered salvageable property because it was not cargo, where a helicopter either cannot or will not leave a vessel, its situation bears a strong resemblance to that of traditional cargo. Here, it is undisputed that the helicopter's crew chose not to fly the helicopter off the Vessel.[296] Therefore, the Court is not persuaded by PHI's argument that allowing a salvage claim in this instance would open the door to a slew of salvage suits whenever helicopters land aboard a vessel because of low fuel,

---

[293] Rec. Doc. 17-1 at p. 11.

[294] Rec. Doc. 25 at p. 9.

[295] Rec. Doc. 17-1 at p. 3.

[296] *Id.*

storm activity or an operational concern. Accordingly, the Court cannot rule, as PHI requests, that the helicopter in this case cannot, as a matter of law, be considered salvageable.

### 3.    Whether PHI Is Entitled to Summary Judgment Denying Plaintiffs' Salvage Claim

As outlined earlier, to succeed on a salvage claim, a plaintiff must prove three elements: (1) that the property faced a marine peril; (2) voluntary service was rendered when not required as an existing duty or from a special contract; and (3) the salvage attempt succeeded in whole or in part, or contributed to the success of the operation.[297] Whether a marine peril exists is a question of fact.[298] The peril necessary to constitute a salvage service need not be one of imminent and absolute danger; the danger must simply be present or "reasonably to be apprehended."[299] "The burden of proof that the vessel or property is in peril is upon the one claiming a salvage award."[300] Voluntariness is also ordinarily an issue of fact.[301] Here, PHI does not dispute the success of the operation, the third element of a salvage claim.

As marine peril and voluntariness are both questions of fact, PHI asserts, as a preliminary matter, that the alleged facts relied upon by Plaintiffs in their opposition are, for the most part, improper summary judgment evidence because they are "inadmissible hearsay, via unsworn 'summaries' of what Plaintiffs claim their witnesses may say at trial."[302]

---

[297] *United States v. EX-USS CABOT/DEDALO*, 297 F.3d 378, 381 (5th Cir. 2002) (citing *Nunley v. M/V Dauntless Colocotronis*, 863 F.2d 1190, 1199 (5th Cir. 1989)).

[298] *See Evanow v. M/V Neptune*, 163 F.3d 1108, 1114 (9th Cir. 1998) (citing *Clifford v. M/V Islander*, 751 F.2d 1, 5 (1st Cir. 1984)).

[299] *See Fort Myers Shell & Dredging Co. v. Barge NBC 512*, 404 F.2d 137, 139 (5th Cir. 1968).

[300] 3A *Benedict on Admiralty* § 63; *see also Am. Home Assurance Co. v. L & L Marine Serv., Inc.*, 875 F.2d 1351, 1355 (8th Cir. 1989) (citing *Clifford*, 751 F.2d at 6).

[301] *EX-USS CABOT/DEDALO*, 297 F.3d at 381–82.

[302] Rec. Doc. 32 at p. 2.

Here, Sunglory, in its opposition, points to the responses to certain interrogatories as evidence of facts in dispute to preclude summary judgment on these two issues. Although answers to interrogatories may be proper summary judgment evidence in some cases,[303] they must nevertheless comply with the Federal Rules of Evidence in order to be admissible as summary judgment evidence.[304] Here, Plaintiffs rely on, for example, the following interrogatory answer as evidence to preclude summary judgment:

**INTERROGATORY NO. 7:**

Please identify the witness(es) who will testify that the "[H]elicopter was in distress since its engine noises indicated it had mechanical problems" and any expertise or background such person(s) had concerning the functioning of helicopter that may have led to such a determination."

**ANSWER TO INTERROGATORY NO. 7:**

The bridge watch of the AEOLIAN HERITAGE, the second mate and an able seaman, as well as the chief mate, will testify that the helicopter appeared to be in distress because of its engine noises, smoke, and subsequent conversations with the pilots and mechanics.[305]

PHI is correct that, as substantive evidence that the helicopter was in fact emitting smoke and making engine noises, the above interrogatory answer would be insufficient evidence as it is hearsay and not based upon the personal knowledge of the witness.[306] However, the interrogatory answer,

---

[303] *See* Fed. R. Civ. P. 56(c)(1)(A) ("[A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:] citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . ., admissions, *interrogatory answers*, or other materials . . . .") (emphasis added).

[304] *See* Fed. R. Civ. P. 33(c) ("An answer may be used to the extent allowed by the Federal Rules of Evidence."); Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support of dispute a fact cannot be presented in a form that would be admissible in evidence.")

[305] Rec. Doc. 25-3 at p. 6.

[306] *See* Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may consist of the witness's own testimony."); Fed. R. Evid. 801(c).

served on PHI on December 22, 2015,[307] just two weeks before PHI chose to file a motion for partial summary judgment on January 5, 2016, alleging that no genuine, disputed issues of material fact exist to preclude summary judgment,[308] *is* persuasive that additional discovery is needed before the Court may grant summary judgment.

Plaintiffs have asserted that the testimony of witnesses who will be unavailable until trial, or shortly before trial, is required to dispute the version of events relied upon by PHI.[309] Rule 56(d) states that, when a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may (1) defer considering the motion for summary judgment or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order. Here, the Court notes that PHI agreed on January 11, 2016, while the motion for summary judgment was still pending and before Plaintiffs filed their opposition, to a joint motion for extension of deposition deadlines for additional time to complete the Federal Rule of Civil Procedure 30(b)(6) deposition of Plaintiffs, a deposition of Chief Mate Spyridon Panagiotoplous, and PHI pilot Joshua Brackett.[310] Furthermore, PHI was on notice from Plaintiffs' answers to interrogatories that the deposition testimony of witnesses including "the chief mate," Spyridon Panagiotoplous, which they later agreed to postpone, would be central to arguments now raised by Defendant PHI.[311]

"Rule 56[(d)] discovery motions are 'broadly favored and should be liberally granted'

---

[307] Rec. Doc. 25-3.

[308] Rec. Doc. 17.

[309] Rec. Doc. 25 at p. 2.

[310]  Rec. Doc. 23.

[311]  Rec. Doc. 25-3 at p. 6.

because the rule is designed to 'safeguard non-moving parties from summary judgment motions that they cannot adequately oppose.'"[312] Therefore, in light of the fact that the Court has agreed, on a joint motion, to extend the deadlines for additional discovery, and Plaintiffs have asserted facts that, if true, could persuade a fact finder to rule in their favor, the Court will deny PHI's motion for summary judgment because the outstanding discovery could provide the evidence that Plaintiffs say it will.

The Court notes that PHI has argued that, even considering this case under the facts most favorable to Plaintiffs, they cannot make out a claim for salvage.[313] However, discovery has not yet been completed, and thus material facts—including those that may be favorable to Plaintiffs—remain outstanding. Therefore, the Court finds that summary judgment on questions of fact is premature, and shall not resolve herein the questions of marine peril or voluntariness.

## IV. Conclusion

As stated above, although PHI correctly argues that, as a general rule, a party who does not participate in the salvage service is not entitled to a salvage award, an exception to the rule permits the owner of a salving vessel to share in the award,[314] even if the owner does not take part in, direct, or even know about the salvage operation.[315] Thus, PHI is not entitled to summary judgment on the ground that the Vessel owners did not join others in this suit. Moreover, the Court does not agree with PHI's argument that the Vessel must have faced significant risk of damage in order to allow

---

[312] *Raby v. Livingston*, 600 F.3d 552, 561 (5th Cir. 2010) (quoting *Culwell v. City of Fort Worth*, 468 F.3d 868, 871 (5th Cir. 2006)).

[313] Rec. Doc. 32 at p. 2.

[314] 3A *Benedict on Admiralty* § 57 (citing *The Blackwall*, 77 U.S. 1 (1869); *The Camanche*, 75 U.S. 448 (1869)).

[315] *DOROTHY J v. City of New York*, 749 F. Supp. 2d 50, 77 (E.D.N.Y. 2010).

the Vessel owners to seek a salvage award in this matter. Alternatively on this issue, the Court concludes that a genuine, disputed issue of material fact exists concerning whether the helicopter posed such a risk to the Vessel, precluding summary judgment on this issue.

Next, the Court cannot agree with PHI that a helicopter that transports passengers to offshore oil platforms cannot be property that may be subject to a salvage award if recovered or saved in navigable waters. Finally, in light of the fact that the Court has agreed, on a joint motion, to extend the deadlines for additional discovery, and Plaintiffs have asserted facts that, if true, could persuade a fact finder to rule in their favor, the Court concludes that genuine, disputed issues of material fact, which preclude summary judgment, remain regarding: (1) whether the helicopter faced a marine peril; and (2) whether the Vessel voluntarily rendered service. Accordingly,

**IT IS HEREBY ORDERED** that PHI's "Motion for Partial Summary Judgment"[316] is **DENIED.**

**NEW ORLEANS, LOUISIANA,** this  4th   day of March, 2016.

*Nannette Jolivette Brown*
**NANNETTE JOLIVETTE BROWN**
**UNITED STATES DISTRICT JUDGE**

---

[316] Rec. Doc. 17.